LEMMON, Judge.
This is an appeal from a jury verdict and judgment awarding $65,000.00 to Harold Cole for personal injuries he sustained while working in the construction of a residence.
The general contractor on the job was Anthony L. Golemi Contractors, Inc. Cole, an employee of the air conditioning subcontractor, A. C. Equipment Service, Inc., was injured in the collapse of a disappearing stairway he was ascending. The stairway had been installed by John T. Poplion, a trim carpenter employed by Golemi Contractors.
Cole instituted suit against (1) Poplion, (2) Golemi Contractors, (3) Golemi, individually and (4) General Accident Fire & Life Assurance Corp., the insurer of Gole-mi and Golemi Contractors.
A. C. Equipment’s workmen’s compensation insurer intervened for recovery of compensation benefits and medical expenses, the amount of which was stipulated.
Golemi and Golemi Contractors filed exceptions of no cause of action and Golemi filed a motion for summary judgment, in which they asserted they were “principals” *67 within the contemplation of R.S. 23:1061 [1] and therefore plaintiff’s exclusive remedy against them was for compensation benefits. R.S. 23:1032; Thibodaux v. Sun Oil Co., 218 La. 453, 49 So.2d 852 (1950). The trial court maintained the corporation’s exception, but held that there was a genuine issue as to a material fact in the determination of Golemi’s tort immunity as a principal. There was no appeal from the dismissal of the corporation.
After a trial on the merits the jury returned the verdict against Golemi and his insurer. The jury also found Poplion negligent, but determined that his negligence was not a proximate cause of the accident. From the subsequent judgment, Golemi and his insurer appealed suspensively. Plaintiff neither appealed nor answered the appeal.
GOLEMI’S TORT IMMUNITY AS A PRINCIPAL
Anthony L. Golemi Contractors, Inc. was incorporated in 1962. Then and as of trial, Golemi was the president, and he and his wife owned 90% of the stock. The other 10% of the stock had been placed in his son’s name because of the then existing legal requirement of three incorporators. Golemi Contractors had enjoyed the status of a “Sub-Chapter S” corporation for Federal income tax purposes, and Golemi had thus reported all of the corporation’s income on his individual income tax return.
When the corporation undertook the construction of a residence, either as a speculative venture or for a customer who did not own the lot on which the home was to be built, the corporation ordinarily took title to the vacant ground. In the present case and in others where the particular lending agency so required, Golemi took title in his own name. In any event, Golemi personally endorsed the corporate obligations when required to do so.
All materials used in construction were ordered through the corporation and paid for with corporate funds. The construction labor was performed by corporate employees whose wages were paid with corporate funds. Sub-contractors entered into contracts with and were paid by the corporation.
Golemi coordinated all of the jobs and performed all of the supervisory duties for the corporation during construction, including general supervision of the work of the corporate employees and sub-contractors, as well as the ordering and delivering of materials. When a house was completed and the act of sale passed to the ultimate purchaser, all proceeds of the sale were deposited into the corporation bank account.
Golemi’s personal income consisted almost entirely of money drawn from the corporation in “the form of a salary,” his only other source of income being receipts from individually owned rental property.
In order to determine whether a person is entitled to tort immunity as a principal, we must first determine whether he is liable for compensation as a principal under the compensation act.
*68 Golemi stated his occupation was a “builder engaged in the occupation of building and selling houses.” He contends that he was a principal under R.S. 23:1061, since he undertook to execute work, which was part of that trade, business or occupation, and verbally contracted with the corporation “for the execution ... of the whole or any part of the work undertaken by the principal.” (Emphasis supplied.)
We disagree with this contention. For all of his activities in the building and selling of houses, Golemi created the legal entity known as Anthony L. Golemi Contractor, Inc., presumably for the purpose of protection from personal liability for the obligations of the corporation and for the acts of its employees'. As long as the corporation fulfilled the conditions required by law for existence as a legal entity, Go-lemi was entitled as a matter of law to that protection from personal liability.
Golemi thereupon undertook to work for the corporation in the business of building and selling houses, and for these work activities he received a salary from the corporation. In our view his occupation then became a corporation executive. In this respect he was no different from any other corporate employee who receives a portion of the corporate income produced through his efforts. His situation as a shareholder was different in degree only, since he as virtually the sole shareholder in effect received all of the net profits and bore all. of the net losses.
Nevertheless, having availed himself of corporate protection-, Golemi as a shareholder was entitled to the usual freedom from liability to employees of the corporation for compensation benefits. Although R.S. 23:1061 was designed to prevent the illegal and fraudulent imposition of a “straw” person for purposes of avoiding compensation liability, the statute was not intended to prohibit the use of a legal device authorized by other positive law for the purpose of limiting liability. There is no evidence that the corporation was inadequately financed or thinly incorporated, nor is there any suggestion that Golemi formed a hollow corporation to" avoid compensation liability.
In effect, we hold that Golemi was not in the trade, business or occupation of building and selling houses. He was simply an executive of a corporation which was engaged in that business. This legal conclusion is complicated by the fact that Golemi was also the principal (and for all practical purposes the only) shareholder in the corporation, as well as its president. Nevertheless, he was legally entitled to own all or most of the shares, to hold the office of president, and to be a salaried executive of the corporation, and to still enjoy insulation from liability in actions in which the corporation might be held legally liable. Stated otherwise, if Cole were seeking compensation benefits from Golemi as a principal, he would be required to prove more than the simple fact that Gole-mi incorporated his business.
Under the facts and circumstances proved in this case, the corporation would be liable as a principal under R.S. 23:1061 for a claim by Cole for compensation, but Golemi would not. By the same token, the corporation is entitled under existing jurisprudence to tort immunity, which is not available to Golemi individually.
GOLEMI’S LIABILITY
On May 19, 1969 Cole went to the construction site to start up the air conditioning system. He ascended the disappearing stairway, but found there was no light in the attic. Golemi then climbed the stairway and installed a bulb, but it did not work. Golemi descended the stairway and called an electrician, who went into the attic and repaired the light. As Cole was returning to the attic, the stairway fell with him.
It was later determined that the only nails supporting the stairway were sixpen *69 ny finishing nails. It is undisputed that tenpenny or twelvepenny common nails are the proper nails to use in permanently attaching the stairway.
The usual procedure for installing a disappearing stairway is to first attach it with finishing nails through the trim, to lower, measure and adjust the stairs, and then to permanently attach the stairway with the larger, weight-bearing nails. Poplion testified that he initially attached the stairway with finishing nails, but that he did not permanently attach the stairs with common nails because there were none on the job. He stated that he reported to Golemi right after he installed the stairs that he had done so only with finishing nails. The accident occurred two to three weeks later.
Golemi normally provided the materials by bringing smaller items to the job and having larger items delivered. Generally, he carried finishing nails to the job in a small can and had common nails delivered in fifty pound boxes.
Golemi, who was not on the job when the stairway was installed, denied Poplion reported that the staircase was attached only with finishing nails. On the other hand, Poplion denied that he simply forgot to return and complete the job after obtaining a new supply of larger nails.
Golemi was negligent if he knew that the stairway was improperly attached and still permitted Cole to use these stairs. The evidence is in direct conflict on the key factual issue of Golemi’s knowledge. The jury accepted Poplion’s version that Golemi was aware of this dangerous condition and did nothing to remedy it or to warn other persons not to use the stairway. After examining the record, we cannot find there was manifest error in this resolution of the conflicting testimony.
Although counsel argues that Gole-mi would not have climbed the stairway himself had he known of the situation, he could simply have forgotten that the stairs were not installed with permanent nails, just as he contends that Poplion forgot this. If Golemi was ever made aware that the stairway was installed without weight-bearing nails, he had a duty as supervisor of the construction and as owner of the premises to take steps to correct this dangerous situation or to warn persons using the stairs of the latent defect. Failure to do so constituted negligence on his part.
POPLION’S LIABILITY
As stated previously, the trial court dismissed the suit against Poplion, since the jury found that his negligence was not the proximate cause of the accident. The plaintiff, whose pleadings put Poplion’s negligence at issue, did not appeal from the judgment of dismissal, and that judgment dismissing plaintiff’s claim is now definitive. C.C.P. art. 1842; C.C. art. 3556(31).
However, Golemi now contends that the jury’s finding was patently contrary to the law and evidence, and that plaintiff’s failure to appeal from the judgment dismissing Poplion deprived him and his insurer of their right of contribution. Analogizing this to a settlement with and release of one of two joint tort-feasors, as in Harvey v. Travelers Insurance Co., 163 So.2d 915, (La.App. 3rd Cir. 1964), Golemi argues that Cole should be allowed recovery of only one-half of the damages which he sustained.
The holding of the Harvey case was :
“We conclude, therefore, that where the claimant in a tort action settles with and releases one of two joint tort-fea-sors, reserving all of his rights against the other, the remaining tort-feasor is thereby deprived of his right to enforce contribution against the one who has been released. And, since the claimant by his own act has deprived the unreleased tort-feasor of this right to enforce contribution, he can recover from the latter only one-half of the damages which he sustained.” (P. 921)
*70 However, the opinion pointed out that if it was determined at the trial on the merits that the released party was not negligent and thus not a joint tortfeasor, the release would not have the effect of reducing the claim against other parties who may be determined to be tortfeasors.
The rationale of the Harvey case is that a claimant who remits the debt of one tort-feasor has no further rights against that party to which a cotortfeasor can be subro-gated. But the release of a person who is ultimately determined not to be a tort-feasor imposes no detriment upon those parties who are determined to be tort-feasors.
Here, the jury determined that Poplion was not a tortfeasor and dismissed plaintiff’s claim against him. Plaintiff did not voluntarily remit a debt, as was done in the Harvey case. Rather, the jury determined that no debt was due. Plaintiff, apparently satisfied with the judgment, chose not to exercise his right to appeal. Golemi was “deprived” of appellate review on the issue of Poplion’s liability, not by plaintiff’s failure to appeal, but by his own failure to seek contribution by a third party demand.[2]
The issue of Poplion’s liability to Cole was framed by the pleadings between those two parties, neither of whom sought appellate review. Golemi’s pleadings only asked for a dismissal of plaintiff’s suit against him, and Golemi’s appeal only entitles him to a review of the judgment which simply denied him that relief.
This question is really one of the scope of an appeal. We believe that a defendant, who does not file a third party demand for contribution against an alleged joint tortfeasor, is not entitled to an appellate review of that party’s liability to the plaintiff, which would form the basis of a demand for contribution.
QUANTUM
On May 19, 1969, the day of the injury, Cole consulted a clinic, which referred him to Dr. Raul Reyes, a general surgeon in charge of fracture service at LSU School of Medicine. Dr. Reyes saw him 50 to 60 times between the first visit and the date of trial li/£ years later. The initial examination revealed tenderness and swelling of the left foot, but no evidence of fracture. When Cole did not respond to conservative treatment of rest, whirlpool and physiotherapy, consultations were obtained, but measures such as corrective shoes gave only temporary relief.
On April 27, 1970 Cole was hospitalized for an evaluation as to vascular instability, Dr. Reyes suspecting causalgia, a burning pain due to injury to a peripheral nerve. Through sympathetic blocks Dr. Reyes determined that emotional stress was influencing his condition, and abandoned the diagnosis of causalgia and a planned sympa-thectomy. However, he felt that Cole was definitely experiencing pain.
Cole exhibited coldness of the foot, tenderness on motion of the toes, swelling and discoloration. His limp was ascribed to fibrosis or scar tissue, a condition of stiffness which is permanent but can be made more pliable. Dr. Reyes estimated a permanent disability of 5% to 10% and stated that Cole would probably always have a slight limp. At time of trial he felt that Cole should avoid long periods of walking or standing for a year or so. He was indefinite about his ability to return to his former occupation, but encouraged him to try. Complications which lengthened the *71 recuperative period were marked flat feet and severe emotional disturbances.
Dr. Irvin Cahen, an orthopedic specialist; examined Cole only once, on November 4, 1969. He found coldness, which he attributed to a constriction of the peripheral arteries, but found no deformity or swelling. He suggested continuation of the corrective shoe and a metatarsal bar support. He further suggested a re-evaluation of neurocirculatory abnormality, since relief was obtained by nerve blocks, and consideration of a neurectomy, the dissection of the nerve relieved by the blocking. Because of demineralization, which results from disuse and improves with use, he believed that Cole was experiencing discomfort at the time.
Dr. Irving Redler, an orthopedic specialist, first saw Cole on September 25, 1969. He found limitation of motion in the joints of the toes and tenderness to pressure, and felt that scar tissue was keeping the joints from moving. He recommended exercise involving stretching of the joints, and improvement was exhibited on subsequent visits. Improvement continued until Cole broke a blood vessel while performing his exercises in July, 1970, and swelling and discoloration appeared. When he last saw Cole in October, 1970, the doctor estimated a 15% to 20% disability, which he felt would improve . if Cole “stayed with it,” and expressed the opinion that the outlook for accomplishing recovery of the use of his foot was reasonable, although he would probably always retain some small amount of disability.
Dr. G. R. Cary, another orthopedic specialist, first saw Cole in August, 1969. He noted swelling and discomfort, but no loss of range of motion. He found no evidence of residual trauma except vascular instability and osteoporosis or leaking of calcium from the bone, which redeposits when use is resumed. In October, 1970, he found atrophy (which indicated lack of use), redness, swelling and discomfort at the extreme ranges of motion. He recommended that Cole push himself more through normal activity and felt that he would fully recover within six months to a year.
Therefore, a fair evaluation of the medical evidence is that Cole was disabled for the U/2 years between the accident and the trial and would continue to be disabled for another six months to a “year'or so”. The pain and discomfort that Cole suffered from the injury was complicated by flat feet and emotional problems. His prognosis was for eventual recovery with minimum permanent disability, which would probably cause him to walk with a slight limp.
The jury award of $65,000.00 was an un-itemized lump sum. We conclude that the evidence does not justify an award of that magnitude.
Cole’s net wages (rounded) were $7,500.-00 for 1967, $8,700.00 for 1968, and $3,200.-00 for the first 4J4 months of 1969. These figures represent an average annual net income of $8,500.00. The evidence, taken in the light most favorable to the appellee, supports an award of loss of wages (past and future) for a total of three years, or $25,500.00.
None of the medical experts expressed the opinion that Cole would be substantially disabled beyond the period covered by the foregoing award for loss of wages. We believe that the medical evidence, taken as a whole, was insufficient to establish permanent impairment of earning capacity.
The stipulation established that Cole’s medical expenses (paid by the compensation insurer) up to the date of trial were $1,258.93. There was no evidence as to anticipated future medical expenses.
The balance of the jury award, $38,241.-07, must be attributed to damages for past and future pain and suffering and for permanent -disability. This award for those damages is so excessive as to constitute an abuse of discretion by the jury. Considering the medical testimony outlined in detail above, we believe that an award of *72 $15,000.00 will adequately compensate plaintiff for those damages.
Accordingly, the judgment of the trial court is amended to decrease the amount of the award from $65,000.00 to $41,758.93, and as amended, the judgment is affirmed.
Amended and affirmed.

. R.S. 23 :1061 provides in pertinent part as follows :
“Where any person (in this section referred to as principal) undertakes to execute any work, which is a part of his trade, business, or occupation or which he had contracted to perform, and contracts with any person (in this section referred to as contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any employee employed in the execution of the work or to his dependftnt, any compensation under this Chapter which he would have been liable to pay if the employee had been immediately employed by him; and where compensation is claimed from, or proceedings are taken against, the principal, then, in the application of this Chapter reference to the principal shall be substituted for reference to the employer, except that the amount of compensation shall be calculated with reference to the earnings of the employee under the employer by whom he is immediately employed.”

. A creditor may seek recovery from any one of several alleged codebtors in solido, C.C. art. 2094, and the codebtor thus sued may seek to enforce contribution against his solidary codebtor by making him a third party defendant in the suit, C.C. art. 2103. Similarly, when a creditor judicially asserts bis claim against all alleged codebtors in solido, any of the co-debtors may protect his right to contribution (and to appellate review of the denial thereof) by filing a third party petition against his codefendant. C.C.P. art. 1111.