Gibson A. BARNETTE, Appellant
(Defendant),

v.

Michael L. DOYLE, Appellee (Plaintiff).

No. 5342.

Supreme Court of Wyoming.

Jan. 23, 1981.

Jerry A. Yaap and Richard E. Day, Casper, for appellant.

James R. McCarty, Casper, for appellee.

Before ROSE, C. J.*, and McCLINTOCK, RAPER **, THOMAS and ROONEY, JJ.

McCLINTOCK, Justice.

Plaintiff, Michael L. Doyle, was injured when an unattended truck ran over him, crushing his legs. He brought suit against Lenise Williams, the driver of the truck and a fellow employee, and Gibson A. Barnette, the president, director, shareholder of plaintiff's corporate employer and a fellow employee. The jury found that Barnette was 100 percent culpably negligent and awarded Doyle $84,000.00 in damages. Barnette has raised the following issues on appeal:

1. The trial court erred in denying his motion to dismiss because defendant is immune from suit under the Wyoming Workers' Compensation Act; he is not a coemployee.

2. Even if this court finds that defendant is a coemployee, he did not have a duty to provide reasonably safe equipment.

3. The doctrine of assumption of the risk bars recovery.

4. The trial judge erred when he refused to give defendant's offered Instructions A, B and C.

5. There is insufficient evidence to support the jury's finding of culpable negligence.

 (a) Plaintiff failed to prove that defendant knew or should have known that the emergency brake was defective and failed to have it repaired; and

 (b) Plaintiff failed to prove that defendant employed an incompetent coemployee.

6. It was error to instruct the jury that a violation of a statute is evidence of culpable negligence.

7. The trial court erred in failing to grant a mistrial when plaintiff's attorney asked on voir dire if any of the jurors worked for insurance companies and also "based upon the confusion which arose as a result of the district court's instructions to the jury that insurance was not involved in the matter."

8. The trial judge erred in failing to instruct the jury that the award would not be subject to federal income tax.

9. The jury's failure to answer question number 5 of the special verdict form that

* Chief Justice since January 5, 1981.

** Chief Justice at time of oral argument.

requested the jury to find the percentage of negligence that defendant contributed to the occurrence "resulted in an irregular or perverse verdict."

10. The award of damages is excessive and contrary to the evidence presented.

Michael Doyle went to work for Casper Mud Service on August 16, 1976 and was employed by this company until he was injured on October 21, 1977. Casper Mud Service sells and delivers products that are used primarily in connection with drilling rigs.

On October 21, 1977 Doyle and Williams, a fellow employee, were to deliver cement to a uranium rig located near Linch, Wyoming. Doyle was driving a 1976 two-ton Ford truck, and Williams was driving a 1973 two-ton GMC truck. This was the first time Williams had driven a truck for Casper Mud Service. Each truck was loaded with 160 sacks of cement. In order to reach the drilling location, these two men had to unlock and open a gate that was secured with a padlock. Because Doyle had delivered products to this drilling site before, he knew the combination to the lock, so that when they arrived at the gate, Doyle unlocked and opened the gate. After opening the gate, Doyle drove his truck through the gate and parked his truck on a slight incline immediately north of the gate. However, after Doyle drove through, the gate swung half-way shut. Doyle got out of his truck and reopened the gate. Williams drove through the gate, stopped his truck, set the emergency brake and waited a few minutes to see if the truck would roll. He then got out of the truck and walked back to the gate where Doyle was, so that he could learn the combination of the lock. A short time after Williams got out of the 1973 GMC truck, it rolled backwards, knocked Michael Doyle to the ground and ran over his legs.

## IMMUNITY FROM SUIT UNDER THE WYOMING WORKER'S COMPENSATION ACT

The first question is whether the Wyoming Worker's Compensation Act has granted Barnette immunity. Because this is a question of first impression for this court, we must look to the language of the Act, its history and purpose.

Worker's compensation laws were enacted during the later part of the nineteenth century in order to provide social insurance for victims of industrial accidents, and this compensation is not based upon fault or the breach of a duty owed by the employer to the injured employee. These laws were not enacted to abrogate existing common-law remedies that protected injured workers. At the time these laws were enacted, it has been estimated that only one-fourth of the injured workers were being compensated for their injuries under the limited common-law remedies. *Boggs v. Blue Diamond Coal Company*, 6 Cir., 590 F.2d 655, 658 (1979), cert. denied 444 U.S. 836, 100 S.Ct. 71, 62 L.Ed.2d 47.

The lack of recovery has been attributed to

"[t]he so-called 'unholy trinity' of judicially-created employer defenses, assumption of the risk, contributory negligence and the fellow servant rule, were developed and strictly enforced as legal rules in the last half of the nineteenth century . . ." *Boggs*, supra, 590 F.2d at 658.

Since the worker's compensation laws were enacted, the common-law tort principles, the defenses of assumption of the risk, contributory negligence and the fellow-servant rule have been narrowly construed or abolished. However, the benefits received under such laws have remained low, "and the compromise which was extended immunity from common-law liability to employers has remained in place." *Boggs*, supra, 590 F.2d at 659. As the United States Congress stated in the Occupational Safety and Health Act of 1970, Public Law 91–596 —Dec. 29, 1970—Sec. 27(a)(1)(B), (29 U.S. C.A. § 676(a)(1)(B)):

"Sec. 17. (a)(1) The Congress hereby finds and declares that—

"(B) [I]n recent years serious questions have been raised concerning the fair-

ness and adequacy of present workmen's compensation laws in the light of the growth of the economy, the changing nature of the labor force, increases in medical knowledge, changes in the hazards associated with various types of employment, new technology creating new risks to health and safety, and increases in the general level of wages and the cost of living."

The courts have responded to this inadequacy by "liberally construing the coverage provisions of workmen's compensation acts while narrowly construing the immunity provisions." *Boggs*, supra, 590 F.2d 659. This court, like the majority of courts, has narrowly construed the immunity provisions of our own act. For example, in *Markle v. Williamson*, Wyo., 518 P.2d 621 (1974), this court held that an injured employee has a common-law right to bring suit against a coemployee and that the worker's compensation statutes do not grant coworkers immunity from suit.[1]

Here, Barnette contends that he is immune from suit because he is the president, director and owner of 50 percent of the stock of Barnette Enterprises, a family owned corporation, and he is not an employee of the corporation as required by the Wyoming Worker's Compensation Act. Plaintiff argues that Barnette is not immune because he was in charge of the day-to-day operation of the company and that Barnette failed to have the emergency brake on the 1973 GMC truck repaired after being advised that the brake was not working.

During trial, Barnette testified that "Casper Mud Service is a division of Barnette Enterprises," that he is a coemployee of Casper Mud Service and that he receives a salary from that company. In a deposition, Charles Doyle, a coemployee, testified that Barnette ran Casper Mud Service and that Barnette was at the company almost every day.

There is no doubt that the Wyoming Worker's Compensation Act would preclude a suit against the corporate employer unless the employment was unlawful or illegal. *Jordan v. Delta Drilling Company*, Wyo., 541 P.2d 39, 48 (1975). However, while the Act creates liability without fault, it also allows an injured employee to bring a third-party action against coemployees who are personally responsible for the victim's injuries if these coemployees were culpably negligent. § 27–12–103, W.S.1977; *Abeyta v. Hensley*, Wyo., 595 P.2d 71, 73–74 (1979). The question then is, where does Mr. Barnette stand when he is both an officer and stockholder in the corporation and a coemployee?

In raising the contention that he is immune from suit because of the Wyoming Worker's Compensation Act, Barnette has ignored the legal entity of Barnette Enterprises, Inc. Presumably, Barnette and his wife created this legal entity for the purpose of protecting themselves from personal liability for the obligations of the corporation, the acts of the corporation's employees, and worker's compensation benefits. After the corporation was formed, Barnette undertook to work for Casper Mud Service, a division of the corporation, and he received a salary from that company. Therefore, when Barnette became an employee of his corporation, he assumed the additional role of a coemployee. And as a coemployee, he is liable for the breach of any duty that he owes to his fellow employees. *Cole v. Golemi*, La.App., 271 So.2d 65, 68 (1972); *Stevens v. Lewis*, 118 N.H. 367, 387 A.2d 637, 638 (1978). As was said in the latter case:

"The defendant before the bar is the president, treasurer, sole stockholder and a director of the Park Manufacturing Company, a Massachusetts corporation engaged in producing shoe components . . . .

\* \* \* \* \* \*

---

1. *Markle* was decided before the amendment to § 27–12–103, W.S.1977, that prevents an injured employee from bringing an action against

a coemployee unless it can be shown that the coemployee was culpably negligent.

"As the defendant has noted, New Hampshire is one of only fourteen States that permit employees covered by workmen's compensation to maintain common law tort actions against fellow employees. We did this as a matter of statutory interpretation in *Tuttle* [*Merchants Mut. Cas. Co. v. Tuttle*, 98 N.H. 349, 101 A.2d 262 (1953)] and have adhered to that rule consistently. See *Vittum v. New Hampshire Ins., Co.*, supra 117 N.H. [1] at [5], 369 A.2d [184] at 187. '[E]ven "a person who is a corporate officer, director, stockholder, or all three can still be treated merely as a co-employee for purposes of being held accountable in a damage suit..."' Id. ...

"However, as we implicitly recognized in *Vittum*, there is a narrow class of persons who are alter egos of their corporations. These persons incorporate to obtain the legitimate advantages of doing business in corporate form, *e. g.* primarily limited liability and tax savings. The corporate alter ego's income usually does not derive from his ownership of the corporation's stock. Very few such people incorporate and then rely on their dividends to provide their day-to-day income. Since their business provides their sole, or at least their primary, source of income, they become employed by their corporation, usually as one or more of its high officers. They derive their income from the salary they receive.

"When such a person incorporates, he has not altered the fundamental nature of his business, merely its form. We believe that this change of form should not vitiate the protection he would derive from RSA 281:12 had he chosen to do business as a sole proprietorship or in partnership. Nevertheless, when the corporate alter ego becomes an employee of his corporation, he assumes the additional role of a fellow employee. As a fellow employee, he then becomes liable for the breach of any duty he owes to his colleagues who are also employed by the corporation...."

Under the provisions of the Wyoming Worker's Compensation Act, Doyle is granted the right to bring an action against Barnette. Section 27–12–103, supra, of the Wyoming Worker's Compensation Act, provides in pertinent part:

"(a) The rights and remedies provided in this act [§§ 27–12–101 to 27–12–804] for an employee and his dependents for injuries incurred in extrahazardous employments are in lieu of all other rights and remedies against any employer making contributions required by this act, or his employees *acting within the scope of* their employment *unless the employees are culpably* negligent, ..." (Emphasis added.)

The term "employee" is defined in the Wyoming Worker's Compensation Act in § 27–12–102(a)(viii), W.S.1977, as follows:

" 'Employee' means any person who has entered into the employment of or works under contract of services or apprenticeship with an employer engaged in an extrahazardous occupation, except a person whose employment is purely casual and not for the purpose of the employer's usual trade or business, or those engaged in clerical work and not subject to the hazards of the business. *'Employee' also includes the officers of a corporation, the business of which is classed as extrahazardous, if the officers are actually subject to the hazards of the business in the regular performance of their duties,* and the employer elects to come under the provisions of this act by notifying the division by registered mail at least thirty (30) days prior to the effective date of the coverage..." (Emphasis added.)

■ "Employee," as the term is used in § 27–12–102, includes corporate officers. This Act does not bar an injured employee from bringing an action against a coemployee who is also a corporate officer, if that coemployee was culpably negligent and he owed the plaintiff a duty of care. This result is consistent with the majority of courts that have considered the issue. As

stated in 2A Larson, Workmen's Compensation Law § 72.10, p. 14–34 (1976):

> "... In the present setting, modern cases usually hold that a person who is a corporate officer, director, stockholder, or all three can still be treated merely as a co-employee for purposes of being held accountable in a damage suit, although there is *contra* authority..."

An officer, director and shareholder of the corporate employer who is also a coemployee is not granted immunity by the worker's compensation act because such immunity would "confer upon a workman freedom to neglect his duty towards a fellow employee and immunize him against all liability for damages proximately caused by his negligence." *Hockett v. Chapman*, 69 N.M. 324, 366 P.2d 850, 853 (1961). Cited with approval in *Markle*, supra, 518 P.2d at 623.

### DUTY OWED TO THE PLAINTIFF BY A COEMPLOYEE

Having determined that Barnette is not immune from suit, the next question is whether Barnette owed plaintiff a duty under the facts of this case. Barnette contends that even if this court finds that he is not immune from suit, he cannot be held personally liable for failure to provide safe working conditions. Defendant bases this contention upon state court decisions holding that a coemployee is not to be held personally liable when the negligence claimed arises out of a failure to provide safe working conditions. *Garchek v. Norton Co.*, 67 Wis.2d 125, 226 N.W.2d 432 (1975).

While we do not deny the fact that some jurisdictions have supported defendant's contention, defendant has failed to consider that this court has recently answered this question in *Abeyta v. Hensley*, supra, 595 P.2d 71. In *Abeyta*, 595 P.2d at 74, we adopted the rule set forth in Restatement of Agency 2d § 354. This section provides:

> "An agent who, by promise or otherwise, undertakes to act for his principal under such circumstances that some action is necessary for the protection of the person or tangible things of another, is subject to liability to the other for physical harm to him or to his things caused by the reliance of the principal or of the other upon his undertaking and his subsequent unexcused failure to act, if such failure creates an unreasonable risk of harm to him and the agent should so realize."

As we stated in *Abeyta*, supra, 595 P.2d at 74, in order to determine if there was a duty owed, the court must consider the

> "evidence of the actual circumstances surrounding the arrangement between the agent or employee and the master, and the actual circumstances of the master, and the actual circumstances of the injury to the co-employee..."

We begin our inquiry into the question of whether Barnette owed a duty to Doyle, keeping in mind the often-quoted appellate rule that every favorable inference is to be given to the successful party. Upon appeal this court is required to resolve all conflicts in the evidence in favor of the successful party. *True v. Hi-Plains Elevator Machinery, Inc.*, Wyo., 577 P.2d 991, 996 (1978). This court cannot substitute its judgment for that of the trial court's findings of fact, and even if there are no specific findings of fact a judgment carries with it every finding of fact that is reasonably supported by the evidence. *True*, supra, 577 P.2d at 996.

Barnette testified that he was in charge of managing the affairs of Casper Mud Service and that he had the authority to have the equipment repaired. And, while Barnette denied that he was ever informed that the emergency brake was not working on the 1973 GMC two-ton truck, Dennis Booth, a fellow employee, testified that he told Barnette that the emergency brake was not working. Booth testified that after he attempted to use the emergency brake on the 1973 GMC truck and it did not work, he told Barnette he was concerned for his own safety because the brake did

*not work.* Booth testified that in response to this complaint, Barnette told him

"that he wasn't going to make a dime if we kept tearing up the equipment and on that emergency brake if we, if it wasn't working and if we were in the field we should shut it off, shut off the vehicle and set the vehicle in gear so it couldn't operate, so it couldn't roll or anything."

Booth further testified that Barnette did not "come right out and say he would get the repairs made."

■ In rejecting Barnette's contention the trial judge, in a decision letter, stated:

"This Court has observed circumstances under which corporate officers were dismissed from a suit of this nature, it being demonstrated that they in fact had no supervisory duties or other specific connection with the plaintiff's employee and the situation which led to his injury. Here there is no such showing, and for all that is shown it is possible that Mr. Barnette is so connected with events leading to injury as to render him liable."

We agree with the trial judge. There was sufficient evidence presented at trial to support a finding that the defendant owed a duty to plaintiff to furnish reasonably safe equipment.

## THE DOCTRINE OF ASSUMPTION OF RISK WILL NOT BAR RECOVERY

The next question for our consideration is whether the doctrine of assumption of the risk, as operating to bar recovery, has continuing viability in the State of Wyoming where an unsafe working condition was the direct cause of an employee's injuries or death. Defendant contends that

"[t]he evidence does not support the jury finding that . . . [plaintiff] was not negligent in continuing in his employment when he knew of the alleged unsafe condition which is the subject matter of his suit, and the Court erred as a matter of law in failing to direct a verdict in favor of this . . . [defendant] and in fail-

ing to grant this . . . [defendant's] Motion for Judgment Notwithstanding the Verdict or in the alternative, for a new trial."

The judicially created doctrine of assumption of the risk was developed ". . . to insulate the employer as much as possible from bearing the 'human overhead' which is an inevitable part of the cost—to someone—of the doing of industrialized business." *Tiller v. Atlantic Coast Line R. Co.*, 318 U.S. 54, 58–59, 63 S.Ct. 444, 447, 87 L.Ed. 610 (1943). The first notable discussion of this doctrine appeared in *Priestley v. Fowler* [Ex.1837] 3 M. & W. 1, 150 Eng.Rep. 1030. *Priestley* involved a suit brought by a butcher against his employer. The employer directed the plaintiff to accompany certain goods of the employer that were being carried in a van. The van overturned injuring the plaintiff. The plaintiff brought suit against his employer alleging that the employer failed to see that the van was in good repair and that it was not overloaded. This failure resulted in the injury suffered by the plaintiff. Even though the jury returned a verdict in favor of the plaintiff, the court reversed the decision. In so doing the court "laid the doctrinal foundation that would be interposed to defeat in the common law courts the claims of countless injured workers in the ensuing industrial revolution." *Lyons v. Redding Construction Company*, 83 Wash.2d 86, 515 P.2d 821, 822 (1973).

The rationale behind the *Priestley* decision is as follows:

"[T]o allow this sort of action to prevail would be an encouragement to the servant to omit that diligence and caution which he is in duty bound to exercise on the behalf of his master, to protect him against the misconduct or negligence of others who serve him, and which diligence and caution, while they protect the master, are a much better security against any injury the servant may sustain by the negligence of others engaged under the same mas-

ter, than any recourse against his master for damages could possibly afford. *Priestley v. Fowler, supra,* 3 M. & W. at 7." *Lyons, supra,* fn. 1, 515 P.2d at 822.

■ In an effort to alleviate the injustices created by this harsh rule, the English Parliament enacted the Employer's Liability Act, Stats. 43 & 44 Victoria, c. 42. This action was not effective because the English courts merely began to construe the act and employed the doctrine of *volenti non fit injuria* ["damage suffered by consent is not a cause of action," H. Broom, Legal Maxims 181 (10th ed. R. Kersley 1939)] [2]. *Lyons, supra,* 515 P.2d at 822. The attitude adopted by the English courts during this period was described by the court in *Lyons, supra,* 515 P.2d at 822, as follows:

"... In the throes of the great economic upheavals occurring during the industrialization of England, the English common law courts assumed the attitude that each man was his own master and, therefore, need not necessarily choose to be employed under conditions which might expose him to the occupational risks attendant to a particular vocation. If a workman were to engage in a hazardous occupation, the courts of the day assumed or envisioned his wages would be sufficiently higher to somehow compensate for any potential danger..."

American courts, following the example of the English courts, also adopted the same attitude: in order to encourage industrial growth the employee must carry the burden of injuries incurred while the employee is acting within the scope of employment. This rule of law was set forth in *Farwell v. Boston and Worcester Rail Road Corp.,* 45 Mass. (4 Metc.) 49, 57 (1842) as follows:

"The general rule, resulting from considerations as well of justice as of policy, is, that he who engages in the employment of another for the performance of specified duties and services, for compensation, takes upon himself the natural and ordinary risks and perils incident to the performance of such services, and in legal presumption, the compensation is adjusted accordingly...."

The court goes on to point out that the rationale for this rule is that

"[t]hese are perils which the servant is likely to know, and against which he can as effectually guard, as the master. They are perils incident to the service, and which can be as distinctly foreseen and provided for in the rate of compensation..." *Farwell, supra,* 45 Mass. at 57.

The rule that an injured worker must bear the burden also was adopted by the United States Supreme Court. In *Tuttle v. Detroit, Grand Haven and Milwaukee Railway,* 122 U.S. 189, 196, 7 S.Ct. 1166, 1169, 30 L.Ed. 1114 (1887), the Court stated that this rule is

"a rule of public policy, inasmuch as an opposite doctrine would not only subject employers to unreasonable and often ruinous responsibilities, thereby embarrassing all branches of business, ..."

The United States Supreme Court did not recognize "that industry should not be nurtured at the expense of human suffering" until 1942. *Lyons, supra,* 515 P.2d at 823. In *Tiller v. Atlantic Coast Line R. Co.,* 318 U.S. 54, 68–69, 63 S.Ct. 444, 452, 87 L.Ed. 610 (1942), Mr. Justice Frankfurter, in a concurring opinion, stated:

"The phrase 'assumption of risk' is an excellent illustration of the extent to which uncritical use of words bedevils the law. A phrase begins life as a literary expression; its felicity leads to its lazy repetition; and repetition soon establishes it as a legal formula, indiscriminatingly used to express different and sometimes contradictory ideas. Thus, in the setting of one set of circumstances, 'assumption of risk' has been used as a shorthand way of saying that although an

---

**2.** The doctrine of *volenti non fit injuria* originated from Roman law. Under this doctrine a free citizen had the right to sell himself into slavery. *Lyons, supra,* 515 P.2d at 822.

employer may have violated the duty of care which he owed his employee, he could nevertheless escape liability for damages resulting from his negligence if the employee, by accepting or continuing in the employment with 'notice' of such negligence, 'assumed the risk.' In such situations 'assumption of risk' is a defense which enables a negligent employer to defeat recovery against him...."

Beginning with the landmark decision in *Meistrich v. Casino Arena Attractions, Inc.,* 31 N.J. 44, 155 A.2d 90 (1959), in which the Supreme Court of New Jersey abolished the defense of assumption of the risk as a complete bar to a negligence action in cases other than those involving an expressed contract providing for no liability, *Lyons,* supra, 515 P.2d 823–824, a number of other courts have also abrogated the doctrine so far as it acts as a complete bar to recovery. In *Siragusa v. Swedish Hospital,* 60 Wash.2d 310, 373 P.2d 767, 772–773 (1962), for example, the court held that an employee does not assume the risks arising from the employer's negligence. The rationale given for this decision, with which we are in complete agreement, is as follows:

"... If an employee is barred from recovery merely because he was aware or should have been aware of the dangerous condition which caused his injury, then it must be because the employer was only under a duty to give warning of the dangerous condition. Only if the employer's duty is relegated to one of providing warning is it fair or just to allow a defense to the employee's action on the ground that the employee 'received' warning from his self-acquired knowledge and appreciation of the risk involved. On the other hand, if it is true and desirable that the employer has the positive duty to furnish a reasonably safe place to work, it is not just or fair to permit an employer to escape liability for a failure to perform this duty simply because the employee was aware of the danger when he reasonably elected to

expose himself to it while in the course of his employment. To do so is to affirm and deny, in the same breath, the employer's duty of care."

The court goes on to point out that

"[t]o bar recovery when the employee is acting reasonably in exposing himself to a known and appreciated risk is to indulge in the unrealistic and rigid presumption that, in so exposing himself, the employee 'assents' to relieve his employer from his responsibility to furnish a safe place in which to work. Such a presumption has no basis in experience, and is not founded upon any current social policy. The existence of such a notion has been soundly rejected by the courts which have carefully analyzed the matter..." *Siragusa,* supra, 373 P.2d at 773.

While recognizing the rule that an employer has a duty to provide a reasonably safe place to work and reasonably safe equipment, this court in the past has held that the doctrine of assumption of the risk will bar an injured employee from recovering in a negligence action brought against the employer. However, our review of the cases reveals that this court has historically attempted to limit the doctrine of assumption of the risk. For example, in *Boatman v. Miles,* 27 Wyo. 481, 199 P. 933 (1921), this court affirmed a lower court judgment for damages granted to an employee against his employer. The employee was injured by a vicious stallion owned by his employer. This court initially found that the evidence presented at trial warranted a finding that the employer "was negligent, and liable for the injuries received by appellee, unless the latter assumed the risk or was guilty of contributory negligence." *Boatman,* supra, 199 P. at 935. The question before the court was whether the employee assumed the risk.

In discussing the doctrine of assumption of the risk, this court stated:

"What kind of a risk was the one in the case at bar? Ordinary risks, constituting the first class, are those existing after the

master has done everything that he is bound to do for the purpose of securing the safety of his servants. The assumption of this class of risks is predicated, as it were, on the absence of negligence of the master, and to say that such risks are assumed by the servant is but another way of stating that the master is not negligent. Hence some of the courts treat the principle of assumption of risk as applicable only to extraordinary risks, caused by the negligence of the master . . . And, though sometimes spoken of as having assumed the risk, it was really because of the absence of negligence on the part of the master that the plaintiff was held not entitled to recover in the following cases, . . .

" . . . To keep a vicious animal, known to be such, actually or constructively, is, on principle, the same as the keeping of a defective appliance, unsafe place to work, or an incompetent servant, and to give such animal into the charge of an employee is prima facie negligence, and places the risk therefrom outside the pale of ordinary dangers. Such a risk is extraordinary, and is not assumed, except only under the limitations mentioned. To relieve the master from liability for injuries sustained by the servant in consequence thereof, it is necessary that it appear that the employee was fully warned, or that without warning he knew, or should have known, and appreciated the danger; nor, it is clear, can a servant, employed for the purpose of caring for, or working with, animals, be, as a matter of law presumed to know that they are vicious. . . ." *Boatman*, supra, 199 P. at 935–936.

In *Chicago & N. W. Ry. Co. v. Ott*, 33 Wyo. 200, 237 P. 238 (1925), reh. denied 238 P. 287, certiorari denied 269 U.S. 585, 46 S.Ct. 201, 70 L.Ed. 425, this court once again affirmed the lower court's judgment awarding an injured employee damages against his employer. The employee was injured when a door fell on him while he was unloading rails. The crane used in unloading the rails was too short, causing the rails to swing against the door that fell upon the plaintiff. On appeal the defendant contended that the plaintiff assumed the risk and, therefore, was barred from recovery as a matter of law. In rejecting the defendant's contention, this court stated:

" . . . A 'condition', a defect in the hooks and eyes of the door, for instance, might be known and apparent to him, and yet, as already pointed out, the danger therefrom might not at all be known to or appreciated by him. In 26 Cyc. 1217, it is said:

" 'To show that a servant assumed the risks connected with his employment, it must appear, not only that a defect was patent and obvious, but that he knew the *danger* of working under defective conditions. The mere fact that he could see and know the defect will not debar a recovery, unless the *danger* is so open and apparent that no ordinarily prudent person would encounter it.' (Italics are ours.)" *Chicago & N. W. Ry. Co.*, supra, 237 P. at 242.

The question of whether there was sufficient evidence of contributory negligence and assumption of the risk to prevent an injured employee from recovering against his employer's servant was addressed by this court in *Rocky Mountain Trucking Company v. Taylor*, 79 Wyo. 461, 335 P.2d 448 (1959). This case involved an oil company employee's suit for injuries sustained when a large metal tank that was being raised by a winch of the trucking company hired to move the oil company's rig was suddenly lowered and crushed the employee's hand. The employee was placing boards under the tank at the time the injury occurred. In affirming the award of damages granted to the employee by the lower court, this court stated:

" . . . We content ourselves by saying that the acceptance by a worker of employment in such an extrahazardous employment as that entailed in oil-field

work does not serve to exonerate an employer from liability for negligent acts, whether such acts be those of the employer or of the employer's servant. This, we think, adversely disposes of the assumption of risk defense." *Rocky Mountain Trucking Company*, supra, 335 P.2d at 451.

While historically the decisions handed down by this court appear to attempt to limit the harsh result of the doctrine of assumption of the risk, this court has more recently taken a stricter view of the doctrine. For example, in *Berry v. Iowa Mid-West Land and Livestock Co.*, Wyo., 424 P.2d 409 (1967), this court affirmed the trial court's judgment for the employer, notwithstanding the jury verdict for the employee. The employee was barred from recovery from the employer for electric shock and burns. This court held,

"... under the circumstances here present, that if negligence is charged to the employer, then equal and contributory negligence would as a matter of law have to be charged to the employee—the result being that the employee would be barred from a recovery..." *Berry*, supra, 424 P.2d at 412.

The rules of law cited by this court in support of its determination that as a matter of law the plaintiff was not entitled to recover because all danger was open and obvious, are as follows:

"Where a danger is as open and obvious to the servant as to the master, or where the servant has better means of knowledge than the master, he will be charged with such negligence as to bar recovery. 56 C. J. S. Master and Servant § 435, p. 1259; *Ring v. Kruse*, 158 Neb. 1, 62 N.W.2d 279, 285; *Freeman v. Smit*, 193 Wash. 346, 75 P.2d 575, 577–578. See also *Nolen v. Halpin-Dwyer Const. Co.*, 225 Mo.App. 224, 29 S.W.2d 215, 219, where the court gives as a reason for this rule that if either is guilty of any failure the other is guilty of the same.

"In Restatement Second, Agency 2d § 521, p. 489 (1958), it is given as a rule

that a master is not liable to a servant for harm caused by unsafe conditions of employment, if the servant, with knowledge of the facts and understanding of the risks, voluntarily enters or continues in the employment. Also, in *Chicago & N. W. Ry. Co. v. Ott*, 33 Wyo. 200, 237 P. 238, 241, rehearing denied 238 P. 287, certiorari denied 269 U.S. 585, 46 S.Ct. 201, 70 L.Ed. 425, this court adopted the following rule with respect to risks assumed by an employee:

"'A servant assumes (1) the risk of such dangers as are ordinarily and normally incident to his occupation, and workman of mature years is presumed to know them, whether he does or not; (2) such extraordinary or abnormal risks—usually, at least, arising out of the negligence of the master—the conditions and dangers of which he (a) knows and appreciates and faces without complaint, or the conditions and dangers of which (b) are so obvious and apparent that an ordinarily careful person would, under the circumstances, observe and appreciate them. * * *'" *Berry*, supra, 424 P.2d at 411.

In both *Mellor v. Ten Sleep Cattle Company*, Wyo., 550 P.2d 500 (1976), and *Abeyta v. Hensley*, supra, 595 P.2d 71, the traditional doctrine of assumption of the risk, i. e., that "a master is not liable to his servant for harm caused by unsafe conditions of employment if the servant, being cognizant of the risks, voluntarily enters or continues in the employment," *Abeyta*, 595 P.2d at 75, has been acknowledged. However, these cases were decided upon other grounds. In *Mellor*, supra, 550 P.2d at 505, this court held that the employer was not negligent because "there is no reason to believe that the employer should have anticipated the necessity of more tools and more men in order that this operation would be conducted safely." And in *Abeyta*, supra, 595 P.2d at 75, we held "that there was no evidence that Hensley failed to furnish Abeyta with a safe place to work." The plaintiffs were

not barred from recovery as a matter of law because they had assumed the risk.

While this court in the past has expounded the rule that an employee is barred from recovery if he assumes the risk, the absolute defense of assumption of the risk is no longer viable in this state. This court has long held that there is no distinction between the doctrines of assumption of the risk and contributory negligence. *Ford Motor Company v. Arguello*, Wyo., 382 P.2d 886, 891 (1963). Until the enactment of the comparative-negligence statute, § 1–1–109, W.S.1977, in 1973, this court held that both defenses were absolute bars to recovery in negligence suits. *Brittain v. Booth*, Wyo., 601 P.2d 532, 534 (1979).

■ However, the comparative-negligence statute has abolished this harsh result by requiring in pertinent part that

"(a) [c]ontributory negligence shall not bar a recovery in an action by any person or his legal representative to recover damages for negligence resulting in death or in injury to person or property, if the contributory negligence was not as great as the negligence of the person against whom recovery is sought..." § 1–1–109, W.S.1977.

Just as contributory negligence is no longer a complete defense, this court has ruled that, "assumption of risk, as a form of contributory negligence, is not an absolute defense to a negligence action, but is a basis for apportionment of fault." *Brittain v. Booth*, supra, 601 P.2d at 534. We cannot, therefore, agree with Barnette's contention that as a matter of law Doyle should be barred from recovery.

Our departure from precedent is compelled by both public policy and the legislative enactment. The only question for submission to the jury on the issue of plaintiff's negligence is whether the plaintiff was, under the circumstances, negligent with regard to his own safety. It is for the jury to balance the relative measurements of fault.

■ In the case at bar, the jury was instructed that if they found Barnette had a duty to furnish safe equipment, his failure to do so created an unreasonable risk of harm to the plaintiff and furthermore if Barnette was culpably negligent, they could "consider whether Michael Doyle, knowing of the risk, voluntarily entered or continued in the employment of the common employer, in assessing the relative negligence, if any, of the parties." While we believe that the jury should not have been asked to compare culpable negligence to ordinary negligence, we do not believe that by so instructing reversible error was committed. The error was harmless because the jury found that Doyle was zero percent negligent.

We have recently held that

"... § 1–1–109 [the comparative negligence statute] does not mandate reduction of damages on the basis of comparative negligence of the plaintiff if defendant's misconduct is willful and wanton. To hold otherwise would be inconsistent with the purpose behind the doctrine of comparative negligence. The doctrine is designed to ameliorate the harshness of the contributory negligence bar. The court decisions which have not applied the contributory negligence bar to willful and wanton misconduct had the same purpose. *Damages resulting from willful and wanton misconduct are not 'damages for negligence' as that term is used in § 1–1–109.*" (Emphasis added.) *Danculovich v. Brown*, Wyo., 593 P.2d 187, 194 (1979).

In *Danculovich*, supra, plaintiffs were seeking both compensatory and punitive damages arising out of a one-automobile accident.

■ Because ordinary negligence cannot be compared to culpable negligence, a jury must first be required to apportion the ordinary negligence of both the plaintiff and the defendant under the comparative negligence statute, § 1–1–109. If the jury finds that the plaintiff's contributory negligence

is not as great as the defendant's, then the jury must determine whether the defendant was culpably negligent. If the jury finds the defendant culpably negligent, plaintiff's ordinary negligence cannot then be compared to defendant's culpable negligence in apportionment of the damages. "Damages resulting from willful and wanton misconduct" of a culpably negligent co-employee "are not 'damages for negligence,'" *Danculovich*, supra, 593 P.2d at 194.

## REFUSAL TO INSTRUCT ON THE DOCTRINE OF ASSUMPTION OF THE RISK AS A COMPLETE BAR TO RECOVERY

Defendant contends that the trial court erred when it refused defendant's offered Instructions A, B and C. These instructions generally provide that plaintiff cannot recover if the jury finds that he assumed the risk. As we have just discussed, the doctrine of assumption of the risk will not bar recovery in this state; therefore, these offered instructions are incorrect statements of the law. As this court has long held, instructions containing incorrect statements of the law are properly refused. *Benson v. State*, Wyo., 571 P.2d 595, 597 (1977).

## SUFFICIENT EVIDENCE PRESENT TO PROVE CULPABLE NEGLIGENCE

■■■ Defendant's fourth assignment of error is that there is insufficient evidence to support the jury's finding of culpable negligence. There is no allegation that the jury was improperly instructed as to the elements of culpable negligence.[3] When this court is called upon to determine whether there is sufficient evidence to support a finding of negligence or culpable negligence, we assume that the evidence supporting the prevailing party's theory of the

case is true and we do not consider conflicting testimony. Furthermore, as we have frequently stated, our role is not to weigh the evidence but rather to merely determine whether the jury's verdict is supported by substantial evidence. *Ford Motor Company v. Arguello*, supra, 382 P.2d at 890.

While this court has not defined the term "culpable negligence" as used in § 27–12–103, supra, this court has defined the same term as used in Art. 10, Sec. 4, of the Wyoming Constitution that applies to the actions of an injured employee. *Hamilton v. Swigart Coal Mine*, 59 Wyo. 485, 143 P.2d 203 (1943). In *Fuhs v. Swenson*, 58 Wyo. 293, 131 P.2d 333, 338 (1942), this court in essence held that the term "culpable negligence" means willful and serious misconduct. In *Hamilton*, 143 P.2d at 206, this court, in interpreting the *Fuhs* decision, adopted the definition of "willful and serious misconduct" that was set forth in *Gonier v. Chase Companies*, 97 Conn. 46, 115 A. 677, 680 (1921). This definition provides in part that culpable negligence is misconduct that exposes the injured worker to serious danger. This misconduct must be willful, "that is, such as is done purposely, with knowledge—or misconduct of such a character as to evince a reckless disregard of consequences." *Hamilton*, supra, 143 P.2d at 206. A defendant is not culpably negligent if his misconduct arose from a "thoughtless, heedless or inadvertent" act, or an error in judgment. *Hamilton*, supra, 143 P.2d at 206.

■■■ In the case at bar, there is direct evidence, as we discussed earlier, that Dennis Booth told Barnette the emergency brake on the 1973 GMC truck was not working and that Booth also told Barnette that because of this condition Booth was con-

---

**3.** Instruction No. 11 provided:

"Culpable negligence is defined as serious *misconduct which exposes the plaintiff to serious injury.* Not only must the misconduct be of this grave character, but it must be willful. By willful misconduct, it is meant

either intentional misconduct—that is, such as is done purposely, with knowledge—or misconduct of such a character as to evidence a reckless disregard of the consequences to the plaintiff."

cerned for his own safety. While there is conflicting testimony as to whether Barnette knew of the faulty brake, we cannot judge whether the jury should or should not have given credit to Booth's testimony. *Ford Motor Company v. Arguello*, supra, 382 P.2d at 890. We believe, therefore, that this evidence is sufficient to support the jury's finding that Barnette was culpably negligent.

Barnette also contends that he cannot be held liable under the theory of culpable negligence because it was not shown that he knew or should have known that Williams was an incompetent employee or that Williams was, in fact, incompetent, relying upon *Abeyta*, supra, 595 P.2d 71, and *Mellor*, supra, 550 P.2d 500. Furthermore, defendant contends that the trial judge erred in failing to instruct the jury upon this theory.

■ In Count One of his complaint, plaintiff alleged that Barnette was culpably negligent in hiring Williams to operate trucks for Casper Mud Service. Count Two of the complaint alleges that Barnette was culpably negligent because he refused to repair the braking system on the 1973 GMC truck. The jury was instructed as follows:

"... He [plaintiff] alleges that Barnette was culpably negligent in that he knew of the defective braking system on the truck driven by Williams and failed and refused to repair it and/or in hiring Lenise Williams as a driver..."

We do not agree with defendant that *Abeyta*, supra, 595 P.2d 71, or *Mellor*, supra, 550 P.2d 500, require that plaintiff present evidence sufficient to prove the allegations in both Counts One and Two in order to prove culpable negligence. As we have already discussed, there is sufficient evidence in the record to support a finding that defendant was culpably negligent in failing to have the defective brake repaired and, therefore, we feel that proof of one act amounting to culpable negligence is sufficient.

## INSTRUCTION CONCERNING THE VIOLATION OF A STATUTE

■ While defendant contends that the trial judge erred in instructing the jury that a violation of a statute is evidence of negligence when the standard is one of culpable negligence, he has failed to present any authority or cogent argument in support of this contention. We have consistently condemned this practice and, as stated in *Scherling v. Kilgore*, Wyo., 599 P.2d 1352, 1359 (1979), we will not consider alleged error that is supported only with a perfunctory argument and no authority.

## VOIR DIRE EXAMINATION OF THE JURY CONCERNING EMPLOYMENT WITH INSURANCE COMPANIES

Plaintiff's counsel, during voir dire, asked the jurors collectively the following question:

"... Do any of you work for insurance companies—I don't think you do. I didn't notice that on your questionnaires."

Defendant's counsel immediately approached the bench and moved for a mistrial. The jury was dismissed and the trial judge heard argument from counsel. Neither the bench conference nor the conference subsequently held was reported and we have no way of determining what transpired during these discussions.

■ At various points in the transcript, plaintiff's counsel attempted to state for the record what had transpired during these conferences; however, these attempts were objected to by defense counsel. The incomplete state of the record and the confusion created by counsel's failure to have the court reporter present could easily have been averted. Bench and chamber conferences held during trial should always be recorded.

At some point later in the proceedings, the trial judge stated that during the conferences after the trial judge denied de-

fendant's motion for a mistrial, the parties stipulated that the trial judge could instruct the jury that insurance was not involved in the case at bar. The trial judge gave the following instruction to the jury:

"Thank you, Ladies and Gentlemen, and especially the Ladies and Gentlemen of the jury panel, including but not limited to the six of you who are up here and being questioned for cause, as we call it, by the lawyers.

"I direct you to disregard that question which was asked of you by Counsel immediately before we had a Bench Conference and then the recess. I say to you that insurance is not involved in this case and I am authorized to say so by Counsel who inform me of that. I am not saying that out of my knowledge of the file or knowledge of anything else but simply on the basis of being so informed by Counsel who agreed that I may say that to you and for you to regard that as a fact. Now, are we ready to resume the questioning?"

Shortly after the jurors were so instructed, plaintiff's counsel asked the jurors the following questions:

"Do you have any feelings, after hearing a little bit more about the case, as you have at this point, about the nature of the case, that makes you feel like you shouldn't be a juror; the type of injury or the fact that a fellow employee is suing a prior boss and this happened with a piece of company equipment? Do you have any feelings for or against the plaintiff's case at this point that you think might cause you to be unfair if you were a juror?

"That is a difficult question to answer, but if there is anything setting back in your mind that happens to be announcing something to you, please let me know about that now."

One juror then asked:

"The thought comes to my mind, that I would assume with regulations and such of all industry that liability insurance would be carried by the company, this is one of the thoughts that comes to my mind, why, evidently, there is not going to be a charge against the insurance company but rather the individual; and I don't understand that. I can't operate a vehicle without liability insurance and I sure wouldn't want the liability of several employees on my back."

After another bench conference and a conference in chambers, both of which were recorded, the trial judge instructed the jury that although he would like to be able to answer all of the jurors' questions there are times when that cannot be done. He told the jury that "we noted that in this case insurance is not involved. I think the Court ought to leave it there without attempting to explain further or going into detail." He then instructed the jurors their duty was to

"objectively and impartially address yourself and yourselves to the questions that will be laid before you in this case and decide on just those things that are presented here in the courtroom before you in this trial."

Defendant contends that he was prejudiced by the question asked by juror Simon following the court's instruction that insurance was not involved in this case. He further contends that plaintiff's counsel did not ask the question concerning insurance company employment in good faith because counsel knew that there was no insurance, and that the jurors were confused and prejudiced by the trial judge's instructions. Defendant concludes that he "suffered prejudice by virtue of the jury's verdict in the amount of $84,000.00 as punishment for not having insurance coverage."

 Counsel has the right to inquire as to a prospective juror's employment with an insurance company. *Spillane v. Wright*, 127 Colo. 580, 259 P.2d 1078, 1082 (1953). While we recognize that it is prejudicial error for counsel to inform the jury that there is insurance coverage, *Eagan v. O'Malley*, 45 Wyo. 505, 21 P.2d 821, 822

(1933), here the parties stipulated that the jury should be instructed that defendant was not covered by insurance. In the case at bar there has been no showing that the inquiry was made in bad faith or for any other purpose than to obtain information concerning each juror's interest. As this court stated in *Eagan, supra,* 21 P.2d at 822:

"... The rule should be, as we think, that when counsel's conduct and his questions in the case are fairly conducive to the accomplishment of a legitimate end in the proceedings, if, incidentally, prejudice results therefrom to the adverse party, it may not be avoided...."

Furthermore, as was stated in *Gerard v. State,* Wyo., 511 P.2d 99, 100, (1973):

"... While it is not possible, or at least not practical, to enunciate rigid rules concerning the latitude which should be allowed counsel when interrogating prospective jurors, there is universal agreement that the matter is within the sound discretion of the trial court..."

In *Spillane, supra,* 259 P.2d 1078, the trial judge allowed the plaintiff to inquire on voir dire as to the jurors' interest in any insurance company even though the trial judge had been informed that the defendant was not covered by liability insurance. In rejecting defendant's contention that the trial court erred, the Colorado Supreme Court stated:

"Counsel for plaintiff in error contend that the court erred in permitting counsel for plaintiff to inquire on voir dire as to each juror's interest in any insurance company by the usual permitted questions along that line, because counsel for Spillane had advised the court prior to the examination of the jury that Spillane carried no insurance and any reference to an insurance company would be prejudicial to Spillane. The court followed the proper and approved course in the examination as permitted here, and it must be assumed that the inquiry was made to obtain information concerning a juror's interest, and not for the purpose of informing the jury that there was an insurance carrier...." 259 P.2d at 1082.

Finally, while the juror's question in the case at bar demonstrated that the juror was concerned because there was no liability insurance, we believe the judge's subsequent cautionary instruction, instructing the jury that they were to be concerned only with the facts presented in the case and the questions presented to them, was sufficient. We cannot say that any material prejudice resulted from the juror's question and we must also assume that the jury followed this instruction. If there was error, which we seriously doubt, it was cured by the instruction. *Madrid v. State,* Wyo., 592 P.2d 709, 711 (1979).

## FAILURE TO INSTRUCT THE JURY THAT THE AWARD WOULD NOT BE SUBJECT TO FEDERAL INCOME TAXES

Defendant next contends that the trial judge erred in refusing to instruct the jury that the award would not be subject to federal income taxes. Defendant relies upon *Norfolk & Western Railway Company v. Liepelt,* 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689, reh. denied 445 U.S. 972, 100 S.Ct. 1667, 64 L.Ed.2d 250 (1980). While *Norfolk & Western Railway Company* does stand for the proposition that a jury must be so instructed, we cannot agree with defendant that this case controls our disposition of this question.

The question of whether *Norfolk & Western Railway Company* requires state courts to instruct juries, in cases controlled by state law, that an award is not subject to federal income taxes was recently addressed by the Fifth Circuit Court of Appeals in *Croce v. Bromley Corporation,* 5 Cir., 623 F.2d 1084 (1980). In rejecting the defendant's contention that the decision in *Norfolk & Western Railway Company* was controlling, the Fifth Circuit states:

"We are convinced that *Liepelt* [*Norfolk & Western Railway Company v. Liepelt*] does not control our decision here. The wrongful death action in *Liepelt* arose under the FELA and not under a state statute, as the instant case did. In our view, this distinction is crucial. In discussing the issue of whether federal or state law governed the propriety of the court's refusal to give the instruction in *Liepelt*, the Supreme Court specifically acknowledged the federal nature of suits brought pursuant to the FELA:

> " 'Whether it was error to refuse that instruction, as well as the question whether evidence concerning the federal taxes on the decedent's earnings was properly excluded, is a matter governed by federal law. It has long been settled that *questions concerning the measure of damages in an FELA action are federal in character.* See, e. g., *Michigan Cent. R. Co. v. Vreeland*, 227 U.S. 59, 33 S.Ct. 192, 57 L.Ed. 417. This is true even if the action is brought in state court. See, e. g., *Chesapeake & Ohio Railway Co. v. Kelly*, 241 U.S. 485, 491, 36 S.Ct. 630, 632, 60 L.Ed. 1117.[5]

> " '[5] One of the purposes of the Federal Employer's Liability Act was "*to create uniformity throughout the Union*" with respect to railroads' financial responsibility for injuries to their employees. H.R.Rep.No.1386, 60th Cong., 1st Sess., p. 3 (1908). See also *Dice v. Akron, Canton and Youngstown R. Co.*, 342 U.S. 359, 362, 72 S.Ct. 312, 314, 96 L.Ed. 398; *Brady v. Southern Railway*, 320 U.S. 476, 479, 64 S.Ct. 232, 234, 88 L.Ed. 239; Hill, Substance and Procedure In State FELA Actions—The Converse of the Erie Problem?, 17 Ohio St.L.J. 384 (1956).'

*Id.* 100 S.Ct. at 757 and n.5 (emphasis added). In the instant case federal concerns are lacking; this wrongful death action is a statutory creation of the state, and the measure of damages to be recovered, as we noted above, ... is governed by state law. Nor is the need for uniformity throughout the United States, which was '[o]ne of the purposes of the Federal Employer's Liability Act,' *id.*, 100 S.Ct. at 757 n.5, implicated in a cause of action brought to vindicate a state-created right. Despite some broad language approving an instruction that informs the jury that an award of damages will not be subject to income tax, *see id.* 100 S.Ct. at 759, there is no suggestion that the Supreme Court in *Liepelt* intended to *require* a trial judge to give such an instruction in wrongful death actions predicated upon statutes." *Croce v. Bromley Corporation*, 5 Cir., 623 F.2d 1084, 1096–1097 (1980). Also see *Vasina v. Grumman Corporation*, E.D.N.Y., 492 F.Supp. 943, 944–945 (1980).

Because the issue is procedural and does not involve a federal question, we find that *Norfolk & Western Railway Company* does not control the resolution of this issue. However, this court has never addressed the question of whether a jury should be instructed that an award is not subject to federal income tax. In the absence of controlling authority, we must look to the other state courts for guidance.

The great majority of state courts that have addressed the question of whether a trial judge is required to instruct a jury that an award is not subject to federal taxation have held that no such instruction is required. *Coleman v. New York City Transit Authority*, 37 N.Y.2d 137, 371 N.Y. S.2d 663, 670, 332 N.E.2d 850, 855 (1975); Damages—Considering Income Taxes, 63 A.L.R.2d 1393, 1408 [§ 6b].

For example, in *Coleman*, supra, the court rejected the defendant's contention that the trial court erred in failing to instruct the jury that the damage award would not be subject to either federal or state income taxes. The rationale for such a rule was expressed by Chief Judge Breitel:

> "I agree entirely with the dissenting opinion by Judge Jasen, except so much of the latter part which would permit or require instruction in personal injury cases to juries on the income tax consequences of awards in favor of successful

plaintiffs. The problem is a complicated one and not simply resolved. Apart from the intricacy of the tax laws, I do not see how or why the tax problem should be separated from those of the different varieties of insurance, including Medicare and Medicaid, and not least of all, by any means, lawyer fees and costs of investigation and experts. I understand the temptation to treat with the problem but do not believe the time has arrived for its solution or that an acceptable solution has been presented." *Coleman*, supra, 371 N.Y.S.2d 675, 332 N.E.2d 858–859, Chief Judge Breitel, concurring in the dissent.

The Supreme Court of Illinois has set forth the following reasons for rejecting the defendant's contention that the jury must be instructed as to the fact that an award is not subject to federal income tax:

"... In *Hall v. Chicago and Northwestern Ry. Co.*, 5 Ill.2d 135, at 151–152, 125 N.E.2d 77, at 86, this court observed: 'It is a general principle of law that in the trial of a lawsuit the status of the parties is immaterial. Thus, what the plaintiff does with an award, or how the defendant acquires the money with which to pay the award, is of no concern to the court or jury. Similarly, whether the plaintiff has to pay a tax on the award is a matter that concerns only the plaintiff and the government. The tort-feasor has no interest in such question. And if the jury were to mitigate the damages of the plaintiff by reason of the income tax exemption accorded him, then the very Congressional intent of the income tax law to give an injured party a tax benefit would be nullified.' " *Raines v. New York Central Railroad Company*, 51 Ill.2d 428, 283 N.E.2d 230 (1972). U.S. cert. denied 409 U.S. 983, 93 S.Ct. 322, 34 L.Ed.2d 247.

The Supreme Court of Illinois has also stated:

"It may be conceded that the possibility of harm exists if the jury is left uninformed on this matter; on the other hand, it is conceivable that the plaintiff could be prejudiced if they were told of this law. In either case, however, the possibility is speculative and conjectural, and such being the case, it is better to instruct the jury on the proper measure of damage and then rely on the presumption that they will properly fulfill their duty by following said instructions." *Hall v. Chicago & North Western Railway Company*, 5 Ill.2d 135, 125 N.E.2d 77, 85–86 (1955).

The minority of state courts that have held that it is error for the trial judge to fail to instruct on the subject of federal income taxes have for the most part premised this result upon the following reason:

"... [T]here is a sound purpose in having the court instruct the jury that the damage award is not subject to income taxation itself. This is to prevent a jury which might think otherwise from improperly increasing the verdict to protect plaintiff from the impact of such taxes..." *Tenor v. Nu Car Carriers, Inc.*, 67 N.J. 466, 341 A.2d 613, 629 (1975).

Following the lead of the majority of state courts that have decided the issue, we do not believe a trial judge is required to instruct a jury that an award will not be subject to federal income taxes. We so hold because we do not believe that such an instruction is material to the proper determination of damages; nor do we believe that a jury should be instructed on federal taxes when it is not also instructed as to the effect of the cost of attorneys fees, the costs incurred in preparing the case or the various types of insurance that may be involved. The trial judge in the case at bar correctly refused this offered instruction.

## JURY'S FAILURE TO ANSWER ONE QUESTION OF THE SPECIAL VERDICT FORM

Defendant also contends that the jury's failure to answer question number 5

of the special verdict, concerning the percentage of negligence that defendant contributed to the occurrence, created an irregular or perverse verdict. While we agree that the jury failed to answer this question, they did find that defendant was the only person who was culpably negligent and that plaintiff was not negligent. These findings lead to the logical conclusion that the jury found that defendant was 100 percent culpably negligent and therefore liable. Furthermore, once again defendant has failed to present cogent argument or pertinent authority to support this contention and therefore we need not consider this contention. *Scherling*, supra, 599 P.2d at 1359.

## EXCESSIVE DAMAGES

 Defendant's final contention is that the damages awarded by the jury are excessive because the amount awarded is contrary to the evidence presented and, therefore, the jury must have relied upon an erroneous basis. As stated earlier, the jury awarded plaintiff $84,000.00 in damages. We begin our inquiry by reiterating this court's often-quoted rule that "[b]efore a duly returned verdict of a jury will be set aside as excessive, it must appear it is 'so' excessive as to denote passion, prejudice, bias, or some erroneous basis." *State Highway Commission v. Peters*, Wyo., 416 P.2d 390, 391 (1966).

In support of this contention, defendant argues that while the evidence showed that plaintiff had already incurred $2,522.85 in medical expenses and that he would have future medical expenses arising out of the injuries that he suffered, it was shown "that if the Appellee took care of himself, his troubles would be minimal and in fact, the Appellee could pursue his chosen career of a school teacher." Defendant also takes issue with the fact that plaintiff testified that his doctor told him he could not teach school. Defendant points out that plaintiff's doctor testified that "there was no medical reason why he could not teach school."

A review of the record indicates that plaintiff stated that his doctor "suggested strongly that I didn't do it [teach school]." When the doctor was asked upon cross-examination if there was any medical reason why Doyle could not teach school, the doctor's reply was that if plaintiff could walk around and teach then he would be able to teach as long as he did not stand in one spot. The doctor also indicated that after walking for an hour plaintiff would have to prop his leg up.

While the doctor did not directly state during the trial that Doyle could not pursue his chosen profession, it is not very difficult to understand why Doyle felt the doctor was discouraging him from becoming a high school teacher. Doyle, because of his injury would, for example, be unable to stand up and write on the blackboard, or stand by a student's desk to help the student with a problem. And if Doyle spent an hour walking around the classroom, he would then be required to prop up his injured leg. One is left wondering what Doyle would do with his next class while he was propping up his leg.

On cross-examination, Doyle's treating physician was also asked whether it was true that Doyle would "not experience too much discomfort with the leg so long as he takes proper care of the leg." Doyle's physician replied that "[t]here are times when I don't care what kind of care he has given it [his leg] he is going to have problems, but in general, yes."

There is also testimony that Doyle has suffered substantial pain and suffering and that there is an ulceration on his leg that has never healed. Doyle described the wound in the following way:

"Well, it starts as a pin-point—like a pin-point hole in the leg. There is swelling around it. The swelling comes first and then a pin-point hole and then in a matter of a day or so it just rises rapidly and erupts and it is deep. It is a deep, never healing wound. Puss runs out of it. Blood runs out of it. It is a constant thing.

"If it is open for more than a week or so, it begins to smell horrendously. It is a terrible smell."

Doyle also testified that he can no longer play with his children, that his marital life has changed and that he can no longer hunt and fish. There is also evidence that Doyle's loss of earnings was $28,406.00 as of the date of trial.

There is ample evidence presented in the record to support the damages awarded by the jury, and, therefore, we cannot agree with defendant that the jury relied upon an erroneous basis in arriving at an award.

Affirmed.