**Terry L. BETTS and Kay T. Betts, husband and wife, Appellants (Defendants),**

v.

**Bonnie CRAWFORD, Appellee (Plaintiff).**

No. 98–30.

Supreme Court of Wyoming.

Oct. 13, 1998.

Jeffrey J. Gonda, Jonathan A. Botten (argued), and James L. Salmon of Lonabaugh and Riggs, Sheridan, for Appellants (Defendants).

David B. Hooper, Riverton, for Appellee (Plaintiff).

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN and TAYLOR,* JJ.

GOLDEN, Justice.

Homeowners Terry and Kay Betts filed this appeal seeking a new trial after a jury found that their negligence caused injuries to their housecleaner Bonnie Crawford and awarded her substantial damages. The Bettses contend a new trial is warranted because an expert's surprise medical testimony was presented to the jury, and the trial court's refusal of their proffered jury instruction on Crawford's duty of care prejudiced them.

We affirm.

## ISSUES

The Bettses present these issues for our review:

Is a new trial required under the following circumstances: (1) at trial, an expert witness rendered a previously **undisclosed, surprise** opinion, and (2) the expert's trial opinion **directly contradicted** the expert's opinion as represented in the expert's designation, and (3) the expert's trial opinion **directly contradicted** the expert's opinion given during his deposition, and (4) the opposing counsel relied upon the expert's **disclosed** opinion in deciding not to retain a rebuttal expert, and (5) the trial court **refused to strike** the undisclosed surprise expert opinion?

Is a new trial required because the trial court refused to instruct the jury on an employee's duty to exercise care respecting the usual risks associated with her employment?

Crawford rephrases the issues as:

I. Were the opinions of Dr. Crane (a treating physician) a surprise to Defen-

dants or was his testimony essentially unchanged from his deposition testimony as supplemented by his continuing treatment notes and the notes and deposition testimony of other physicians?

II. Were adequate instructions given to the jury concerning Defendants' theory of the case?

## FACTS

Bonnie Crawford cleaned house for the Bettses for several hours each week. The Bettses have small children, and Crawford occasionally had to pick up items left on the stairs that led to the basement laundry room. On July 22, 1994, as Crawford was carrying bundled sheets to be laundered, she tripped over some items left on the stairs, fell down the stairs, and suffered serious injuries. On October 23, 1996, she filed suit against the Bettses, alleging their negligence caused her injuries.

In her complaint, Crawford alleged that she suffered injuries to her "C-spine, chest, skull, right knee, left lower leg and lower back resulting in multiple contusions and abrasions and post concussion syndrome" and claimed the severe injuries resulted in numerous medical procedures and therapy, continuing pain and suffering, and permanent physical disability. Before trial, Crawford designated Peter Crane, M.D., as one of six medical doctor expert witnesses. Dr. Crane had treated Crawford in July and August of 1994 for her injuries and was deposed by the Bettses on April 9, 1997. On October 1, 1997, Crawford filed her pretrial memorandum listing the medical records and resume of Dr. Crane as exhibits and summarizing his testimony as:

Dr. Crane is plaintiff's treating neurologist and a named expert witness for the plaintiff. He is expected to testify in accordance with his expert designation filed herein, his tests, evaluations and examinations of plaintiff and his deposition taken in this matter, which is incorporated herein by reference. Further, Dr. Crane is expected to testify in accor-

* Chief Justice at time of oral argument.

dance with the medical records of Lander Valley Medical Center.

The Bettses contend that Dr. Crane's deposition testimony was favorable to them, and they decided they did not need to designate an expert to rebut Dr. Crane's testimony. Crawford saw or consulted with Dr. Crane again on May 2, May 14, June 5, and June 13, 1997, and although Dr. Crane's notes are not part of the record, both parties agree that the Bettses were supplied with these notes on July 31, 1997, and September 16, 1997. The Bettses contend that neither these notes, later supplementations, nor Crawford's pretrial memorandum filed on September 30, 1997, informed them that Dr. Crane had changed the medical opinions he gave in his deposition and would testify differently at trial.

Trial was held on November 3, 1997. During direct examination, Dr. Crane testified for Crawford, describing the injuries she suffered at the time of the fall and describing her condition at the time of trial. When asked about the 1994 magnetic resonance imaging (MRI) scan of her brain, Dr. Crane testified:

A. The lumbar MRI scan, the scan of her back was felt to look normal. And the scan of her brain showed a few abnormalities in the brain that were thought to either represent a previous sheer injury, meaning a tearing of the nerve cells, or a demyelinating process. And that means one of a variety of disorders that can damage the insulating sheath around certain nerve cells.

Q. Did that have a particular—that finding, did that have a particular significance to you at that time?

A. Well, at that time, no. I really didn't think it was significant. At least I don't think it had anything to do with her headaches and I still don't. And she really—I'm not totally convinced that she has any symptoms related to them, but I think they could have been a manifestation of the fall and the head injuries she sustained during the fall.

Q. Okay. Have you recently found some additional scientific evidence that supports your opinion in that regard?

A. Yes. I—I used to think that these types of sheering injuries occurred with serious head injuries that would render a person unconscious for days or weeks, or at least hours. And in her case, it's not totally clear that she was unconscious. She may or may not have been unconscious.

But there is—there are some studies that show that you can get this type of injury even with a milder—or with this kind of—it's called diffuse axonal injury, again with a mild head injury, without necessarily losing consciousness. So I think it's possible it did occur—

[Bettses' Attorney]: Well, I'm going—that answer as phrased is speculation. It has to be stricken. If we are going to talk about possibilities—

THE COURT: I will instruct the jury to disregard that answer.

Q. Let me ask you, Doctor, if there's a way you can rephrase your answer to—tell me what you think today of those MRI results.

A. I think that they are compatible with her head injury.

Dr. Crane continued on direct examination with considerable testimony about Crawford's present condition, disabilities, and pain and suffering. On cross-examination, he was questioned about the MRI brain scan and said this:

Q. Okay. So we are talking in the deposition right here about the MRI of the brain, correct?

A. Correct.

Q. And then your next answer talks about the abnormalities that you've just talked about here today that were seen on MRI, correct?

A. Right....

Q. And the next questions says: And it is your opinion that these abnormalities would not have been caused by her fall down the stairs, correct?

A. Yes.

Q. And your answer was: Yes. I think it's quite unlikely. Just because of the fact that they didn't become brighter with the

dye, which with a recent abnormality you would think it would. Correct?

A. Yes. That's right, yeah.

Q. And then the next question: Are these the type of abnormalities that could cause headache symptoms? And your answer to that one was, you don't think so.

A. Correct.

Q. Now she—Mrs. Crawford was discharged from the hospital the day after the MRI studies were completed, correct?

A. Yes.

Q. Is it true that generally, people with these types of muscle injuries get better and improve?

A. I think this is the third time I've been asked that question, and I said 20 to 40 percent of the time they don't. And I didn't say that 60 to 80 they do, so . . .

Q. You expected that Mrs. Crawford would improve when you saw her in August of '94, didn't you?

A. Yes. I thought she would.

Q. Soft tissues and muscles, ligaments, they generally heal given time, don't they?

A. 60 to 80 percent of the time.

The cross-examination continued to elicit testimony from Dr. Crane that in August of 1994, it was his opinion that Crawford was improving and would continue to improve. On redirect examination, he testified:

Q. Do you have a comment to make?

A. Yeah. Just about the abnormalities about her cranial on the MRI scan which I find interesting.

Q. What do you find interesting about the abnormalities on her MRI scan?

A. I'd forgotten that she had received the gadolinium, which is the dye which tends to make certain brain abnormalities brighter depending on what kind of abnormality it is, and depending on the time that the scan is done from—how far from the date of injury the scan is done.

And in fact, just about an hour before coming here, I was doing a literature search on diffuse axonal injury, because I wasn't sure that you could see it with— without having a very severe head injury that would make you unconscious for days

or hours—or hours or days or weeks. But it turns out that you can.

Now, I had forgotten about the gadolinium which was brought up in my deposition. And I guess we would have to talk to a radiologist if one wanted to really be certain about this. But I—my feeling at the time of the deposition was that being only a month from the time of injury, it probably would light up with the dye. And it didn't. So that would make me feel that that was there before the injury. However, one would have to double-check that with a radiologist if that was important.

Q. Apparently you have a question in your own mind about it now, having reviewed some recent literature.

A. Right.

Crawford attempted to enter Dr. Crane's medical records into evidence, and the Bettses objected. The court withheld its ruling and did not enter them into evidence at that time. The next day, the Bettses moved to strike Dr. Crane's testimony, claiming they had never been notified that Dr. Crane had seen Crawford after 1994 and claiming prejudicial surprise testimony. In reply to the trial court's question as to whether Dr. Crane had implied a brain injury, Crawford argued that Dr. Crane had only suggested that his later research revealed the brain abnormalities were possibly related to the fall, but had then withdrawn his testimony when he stated that one would have to check with a radiologist. The trial court ruled that the testimony would not be stricken, and the jury would not be instructed to disregard it. The trial continued, and several more doctors testified for Crawford.

During closing arguments, Crawford did not discuss a brain injury and referred to Dr. Crane's testimony only to argue that Crawford should be compensated for future medical damages because she is among the twenty to forty percent of people who will never fully recover from a lifetime of problems of disabling headaches and will have future expenses. The Bettses' closing argument referred to Dr. Crane's testimony to point out that Crawford had last seen him in August of 1994 when he believed that she had improved and would continue to improve, and had then

not seen him again until 1997 after her lawsuit was filed. On rebuttal, Crawford contended that she had returned to see Dr. Crane at the urging of her attorneys to see if the doctor could help her feel better, and he could not. None of the three arguments contended that Dr. Crane believed that the MRI scan indicated a brain injury.

Before the jury began deliberations, the Bettses offered a jury instruction concerning a servant's assumption of risk of all open and obvious risks of employment. The trial court refused that instruction. The jury returned a verdict finding the Bettses eighty-five percent negligent and Crawford fifteen percent negligent and awarding $178,000 in damages. The Bettses filed a timely notice of appeal and filed a motion to supplement the record with discovery documents, including Dr. Crane's deposition. Crawford objected and, although the order is not in the record, the Bettses inform us that the trial court orally denied their motion during a hearing on January 27, 1998. The Bettses filed the same motion with this Court, and that motion was denied.

### DISCUSSION

The Bettses contend that the change in Dr. Crane's testimony at trial from his testimony in his deposition is prejudicial surprise testimony that the trial court should have excluded, and its admission requires a new trial. Crawford contends that the Bettses had all of Dr. Crane's notes prior to trial, there was no motion in limine made to restrict his testimony, and there was no request for a continuance and, thus, the Bettses did not preserve the error for appeal. Crawford further contends that there was no prejudice because the trial testimony did not amount to a change in testimony and does not constitute surprise testimony.

■ A trial court's decision to exclude evidence at trial because its pretrial orders regarding discovery and disclosure of information were violated is reviewed under the abuse of discretion standard. *Robinson v. Hamblin,* 914 P.2d 152, 155 (Wyo.1996); *Oukrop v. Wasserburger,* 755 P.2d 233, 237–38 (Wyo.1988). The trial court's decision is governed by Wyo. R. Civ. P. 61, which states:

No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

■ On appeal, our rule is that a trial court will not have abused its discretion in determining that an error has not affected the substantial rights of the parties unless it caused a miscarriage of justice, damaged the integrity, reputation, and fairness of the judicial process, or clearly possessed a capacity to bring about an unjust result. *Robinson,* 914 P.2d at 155.

■ We hold the trial court's decision not to exclude the testimony to be proper. The basis for the decision is not in the record; however, it appears that the trial court did not conclude that this particular testimony presented a new theory of recovery. On appeal, the Bettses suggest surprise because the testimony provided evidence of a brain injury that they were unable to rebut with their own expert witness; however, at trial they did not request a continuance. It is established that the appropriate response from a surprised party who wishes to counter testimony is a request for a continuance, and the failure to request one precludes a claim of prejudice. *White v. Bd. of Trustees of Western Wyoming Community College Dist.,* 648 P.2d 528, 537 (Wyo.1982), *cert. denied,* 459 U.S. 1107, 103 S.Ct. 732, 74 L.Ed.2d 956 (1983). Considering that the Bettses only requested exclusion of the evidence, it is also fair if the trial court concluded that the Bettses had not been prevented from effectively cross-examining Dr. Crane by using his previous deposition testimony. Our review of the record leads to this conclusion. We also conclude that the Bettses' case was not harmed by this testimony because, from

the beginning, Crawford sought damages for headaches associated with a concussion; she used Dr. Crane's testimony to argue this to the jury without mention of a brain injury; upon the one objection the trial court did strike testimony for speculation; and Dr. Crane did ultimately state only a radiologist could make a determination of whether or not head injuries reflected by the MRI were caused by her fall at the Bettses' house.

In their second contention, the Bettses complain that the trial court did not correctly instruct the jury on Crawford's duty of care. They contend that a proposed instruction refused by the trial court appropriately presented their theory of defense. It read:

A servant assumes all of the risks and dangers pertaining to his employment which are known to him, or discoverable by the exercise of ordinary care on his part, which includes assuming the risk of all open and obvious risks of employment, even though said risks are directly attributable to his master's negligence.

The proposed instruction cited to *Owl Creek Coal Co. v. Goleb*, 210 F. [209], 127 C.C.A. 27 (1914); *Boatman v. Miles*, 27 Wyo. 481, 199 P. 933, 26 A.L.R. 864 (1921); and *Eiban v. Widsteen*, 31 Wash.2d 655, 198 P.2d 667, 669 (1948). While this proposed instruction was rejected, the instructions given presented Bettses' theory of defense that Crawford's negligence caused the accident and injuries, some of which were preexisting and unrelated to the accident. Regarding the contested issue of breach of duty, the trial court instructed the jury that homeowners must use reasonable care to avoid injury to anyone on the premises with the permission of the homeowners, that an employer had a duty to furnish an employee with a safe place to work, that all persons have a duty to use ordinary care, and that comparative fault applied.

Our standard of review for alleged error in jury instructions is:

Errors of substantive law contained in the language of an instruction require reversal if the error is prejudicial. In reviewing the content of a challenged jury instruction, the charge is considered as a whole. To measure the degree of prejudice, jury instructions are viewed in the light of the entire trial, including the allegations of the complaint, conflict in the evidence on critical issues and the arguments of counsel. The goal of our review is to determine if the charge presents a comprehensive, balanced and fundamentally accurate statement of the governing law to the jury. The charge is deemed adequate if it is not likely to confuse or mislead the jury. The fact that an instruction may have been more precisely drafted or drafted in a way more favorable to a party does not warrant reversal for a new trial.

*State Farm Mut. Auto. Ins. Co. v. Shrader*, 882 P.2d 813, 832 (Wyo.1994) (citations omitted).

While the Bettses concede that the adoption of the comparative negligence statute meant that assumption of risk is no longer an absolute defense to negligence, they insist their proposed instruction was necessary to properly apportion fault. In order to show that the proposed instruction appropriately stated that an employee had a duty of care regarding the usual risks inherent in her employment, the Bettses look to *Barnette v. Doyle*, 622 P.2d 1349, 1361 (Wyo.1981), which concluded that the comparative negligence statute barred assumption of risk as an absolute defense; to *Brittain v. Booth*, 601 P.2d 532, 534 (Wyo.1979), which said that assumption of risk is a basis for apportionment of fault; and to *Anderson v. Louisiana–Pacific*, 859 P.2d 85, 89 (Wyo.1993), which found that an assumption of risk jury instruction given to a jury in a products liability action was harmless error.

In reply, Crawford views the argument as inappropriate for an assumption of risk instruction as well as an improper attempt to predicate liability on a common law classification abolished in *Clarke v. Beckwith*, 858 P.2d 293, 296 (Wyo.1993). She points out that the court gave a general duty of care instruction based on the pattern instruction and the comparative fault instruction, and contends that, considering the law from *Clarke* and *Mellor v. Ten Sleep Cattle Company*, 550 P.2d 500 (Wyo.1976), the jury was appropriately instructed.

In Wyoming, there is no distinction between contributory negligence and assumption of risk when raised as a defense to an established breach of duty. *Brittain,* 601 P.2d at 534. The Bettses misapprehend that part of *Brittain* which states that it is a basis for apportionment of fault. This language in *Brittain* explains that after the enactment of the comparative negligence law, assumption of risk, because it is a type of contributory negligence, merged into the system of comparative negligence, thus, allowing the comparison of fault. *Id.;* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 68, at 496 (5th ed.1984). The Bettses also cannot rely on *Barnette,* which offered a comprehensive discussion of the viability of the assumption of risk defense in the master/servant context and recognized that, in addition to this defense, a form of assumption of risk existed which did not allow a cause of action against an employer. *Barnette,* 622 P.2d at 1356–62. This Court ultimately concluded that, in Wyoming, assumption of risk did not prevent a duty from arising on the part of an employer, and that assumption of risk was no longer a defense because of the enactment of the comparative negligence statute. *Id.* Recently, our discussion in *Halpern v. Wheeldon,* 890 P.2d 562 (Wyo. 1995), in the context of assumption-of-risk language contained in the Recreation Safety Act, WYO. STAT. §§ 1–1–121 through 123 (Supp.1992), effectively confirmed *Barnette's* distinction and recognized that the type of assumption of risk that limits the duty owed by the recreation privilege is primary assumption of risk, which is to be distinguished from secondary assumption of risk, a type of contributory negligence, and an affirmative defense to an established breach of duty. *Halpern,* 890 P.2d at 565. *Anderson v. Louisiana–Pacific* acknowledged that when knowledge of the danger was at issue, assumption of risk remained a defense in a strict liability action because the comparative fault statute did not apply to a non-negligence action. *Anderson,* 859 P.2d at 89. The concurring opinion, however, clarified that the generic assumption-of-risk language was no longer favored over the language appropriate to the "specific category of defense under scrutiny." *Anderson,* 859 P.2d

at 89 (Macy, J., concurring); *and see Halpern,* 890 P.2d at 565.

 Given this state of the law, the Bettses' proposed jury instruction as an affirmative defense would not have presented a comprehensive, balanced and fundamentally accurate statement of the governing law to the jury. We also agree that Crawford's status was that of an invitee on the premises, that Wyoming has abolished predicating liability on the common law classifications of invitee and licensee, and the jury was appropriately instructed that the Bettses owed her a duty to act with reasonable care. *Clarke,* 858 P.2d at 296.

We affirm the judgment.